# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | |
|---|---|
| VALMORE WOOLFORD, Jr., )<br>)<br>Petitioner, )<br>)<br>vs. )<br>)<br>DAVE DORMIRE, )<br>)<br>Respondent. ) | Case number 4:04cv0542 DJS<br>TCM |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

The 28 U.S.C. § 2254 petition of Valmore Woolford ("Petitioner"), a Missouri prisoner, for federal habeas corpus relief is before the undersigned United States Magistrate Judge for a review and a recommended disposition. See 28 U.S.C. § 636(b).

## Background

Petitioner was indicted in August 1999 on six felony charges: one count of first degree burglary, one count of first degree robbery, one count of armed criminal action, two counts of second degree burglary, and one count of stealing $750 or more. (Resp. Ex. B at 6-7.) The first three felony charges related to events that occurred on July 22, 1999, at the home of Kathleen Christ in Creve Coeur, Missouri. (Id.) One of the second degree burglary charges and the stealing charge related to events that occurred the night of July 22 at the home of Harry Eggleston. (Id. at 7.) The other second degree burglary charge related to events that occurred sometime between July 13 and July 29 at a home owned by Eleanor Fry. (Id. at 8.)

Kathleen Christ was the first witness to testify at Petitioner's jury trial on these charges. (Resp. Ex. A at 119.) She was at home the night of July 22, 1999. (Id. at 120.) The only other person there was her son. (Id. at 120-21.) The house was dark, with the exception of her bathroom. (Id. at 121.) She was in the bathroom, talking on the telephone. (Id. at 120.) She heard noise in the den and then in the hallway. (Id. at 121-22.) She assumed it was her other son. (Id. at 121.) She saw the reflection of a flashlight on her mirror and decided to investigate. (Id. at 122.) As she stood up, a man in a multi-colored ski mask, wearing gloves and black clothes, jumped in front of her and pointed a gun at her face. (Id. at 123, 126.) She screamed; he picked up her jewelry box and left. (Id. at 124.) She called the police. (Id. at 128.) She guessed the man's height to be about 5 feet 11 inches. (Id. at 125.) She testified she could identify the approximate body build of the man and could definitely identify the ski mask. (Id. at 130.) She identified a ski mask later shown her by the prosecutor as the one worn by the man. (Id. at 133.)

Nicole DiPretore, a Creve Coeur police officer, was on duty the night of July 22 and was crossing Interstate 270 on Olive Boulevard when she saw a man running north across Olive Boulevard from the front of St. Monica's on the south side of the street. (Id. at 159, 162-63, 193.) She was going to do a "pedestrian check" because he matched the description of the robbery suspect, but she lost sight of him. (Id. at 163-64.) She saw him again as he walked east on the north side of Olive Boulevard across the bridge. (Id. at 165.) She stopped the man; without being asked, he put his hands up in the air. (Id. at 165-66.) In response to her question about where he was coming from, he explained that

he was looking for a gas station.  (Id. at 166.)  Another officer arrived and patted the man down.  (Id.)  The man was wearing jean shorts and a t-shirt.  (Id. at 167.)  "He was very sweaty[,]" and appeared to be short of breath.  (Id.)  He had a bulge in his back left pocket.  (Id.)  He said it was a rag and gloves; it was a rag.  (Id.)  The officers told him he matched the description of someone wanted in an armed robbery in a nearby neighborhood.  (Id. at 168.)  He was also told that "for his own protection" and that of the officers, he was going to be handcuffed and had to sit on the curb.  (Id.)  The man questioned why he was being stopped; he was in the neighborhood looking for apartments and his car had broken down.  (Id.)  Asked why he was in the area where he had first been sighted, he again explained he was looking for a telephone or gas station.  (Id. at 168-69, 172.)  A computer check revealed that the man, Petitioner, was wanted in the City of St. Louis for failure to appear on a traffic warrant.  (Id. at 169, 178.)  He was placed in the police car.  (Id. at 169.)  He agreed to show Officer DiPretore where his car was so his driver's license could be retrieved.  (Id. at 170.)  Petitioner consented to a search of his car.  (Id. at 170, 174.)  Officer DiPretore testified that a person walking out of the apartment complex where Petitioner's car was parked could see a 24-hour gasoline station, a restaurant, and a hotel.  (Id. at 173, 187.)  On the side of the highway where she first saw Petitioner, there were offices and St. Monica's.  (Id. at 173.)

Once at the police station and sitting across from Officer DiPretore's desk, Petitioner asked to make a telephone call to his father.  (Id. at 177.)  She listened to the telephone call.  (Id. at 179.)  During the approximately thirty-minute call, she heard Petitioner tell

the person on the other end that he had been picked up near a church or school. (<u>Id.</u> at 179.) He asked Officer DiPretore the name of the church; she replied it was "St. Monica's." (<u>Id.</u> at 180, 181.) He referred to St. Monica's at least fifteen to twenty times during the conversation and to a statue at St. Monica's. (<u>Id.</u> at 180.)

On cross-examination, Officer DiPretore testified that she did not consider Petitioner to be under arrest when he was handcuffed and told to sit down. (<u>Id.</u> at 198.) He was being detained and was not free to go; however, he had not been arrested. (<u>Id.</u> at 199-200.) She did not read him his Miranda[1] warnings. (<u>Id.</u> at 201, 203, 216, 218.)

The next witness to testify was Jeffrey Lloyd. (<u>Id.</u> at 225.) At the police station on July 23, he had identified a Don Joy Smith and Nephew duffle bag as one belonging to him that had been kept in his house, which was in the vicinity of the July 22 burglary. (<u>Id.</u> at 228-29, 235, 237.)

George Hodak, a lieutenant with the Creve Coeur Police Department ("the Department"), identified a bullet that had been brought to him on July 23 by a Mr. Gilbert. (<u>Id.</u> at 243.) Mr. Gilbert, who lived near where Officer DiPretore first saw Petitioner, heard noises by the side of his house around midnight on July 22. (<u>Id.</u> at 244.) The next morning, he investigated and found a bullet. (<u>Id.</u>) The bullet was a W & W .38 Smith and Wesson and had no metal jacket. (<u>Id.</u> at 245.) Another police officer with the Department, Thomas Rich, testified that early in the morning of July 23 he found a gun and a Crown Royal bag with W & W .38 Smith and Wesson ammunition without metal

---

[1]<u>Miranda v. Arizona</u>, 384 U.S. 436 (1964).

jackets in the area where Officer DiPretore had lost sight of Petitioner.  (Id. at 250, 253-56, 263-64.)  The next week, he seized a table top out of an address near Ms. Christ's.  (Id. at 265, 269.)  There were shoe prints on the table top.  (Id. at 270.)

In the morning of July 23, Robert Darlington, a patrol officer with the Department, searched for a ski mask in the area where Petitioner had been seen and stopped the night before.  (Id. at 272-73, 275.)  At the rear of a statue of the Mother Mary on the property of St. Monica's, he found a black bag.  (Id. at 276.)  He opened the bag and saw some dark-colored clothing, a ski mask, and a flashlight.  (Id. at 281.)  Detective Kohrs photographed and inventoried the contents of the bag.  (Id.)  No one had directed Officer Darlington to search the area of St. Monica's.  (Id. at 283.)

After Officer Darlington's testimony, the court heard arguments on Petitioner's request to introduce evidence that he voluntarily gave Detective Kohrs hair samples.  (Id. at 288-92.)  Tests had not been run on the hair samples because they were contaminated. (Id. at 289.)  Because there were no tests, the prosecutor argued that Petitioner's consent was irrelevant and material.  (Id.)  The court permitted trial counsel to ask Detective Kohrs if Petitioner had been cooperative, but prohibited her from inquiring about his consent to the hair samples.  (Id. at 292.)

Neil Kohrs seized, photographed, and inventoried the contents of the black bag found at St. Monica's.  (Id. at 294-95.)  There were tools, clothing, and jewelry in the Smith and Nephew bag.  (Id. at 296, 298, 301.)  Included in the clothing were a ski mask (earlier identified by Ms. Christ), long black pants, a sweatshirt with a "No Limit" logo

on the front, and three pairs of gloves.  (<u>Id.</u> at 300, 301.)  A beige pillowcase with most of the jewelry was in the bottom of the bag.  (<u>Id.</u> at 301.)  Included in the tools were a "dent puller," a utility pocket knife, and tools ordinarily found in a hardware store.  (<u>Id.</u> at 307.)  Trial counsel asked on cross-examination if Petitioner was cooperative.  (<u>Id.</u> at 308.)  Detective Kohrs replied that he was.  (<u>Id.</u>)

Eleanor Fry identified the table top as one taken from the garage of her deceased mother's house.  (<u>Id.</u> at 314-15.)  The only items kept in the house were furniture and papers.  (<u>Id.</u> at 311.)  Someone had reported to the police on July 29 that there was broken glass in the front yard.  (<u>Id.</u> at 312.)  A garage window was broken, and the door between the garage and the house was open.  (<u>Id.</u>)  No authorized person had been in the house between July 22 and July 29.  (<u>Id.</u> at 313.)

After Ms. Fry's testimony, the court, out of the presence of the jury, summarized an earlier dispute about whether the prosecutor should be allowed to have Petitioner's fingerprints.  (<u>Id.</u> at 325.)  The fingerprint card the police had initially taken was no longer in existence.  (<u>Id.</u>)  Trial counsel objected; her objection was overruled.  (<u>Id.</u>)

When the jury trial resumed, Harry Eggleston testified.  (<u>Id.</u> at 327.)  He lived in the vicinity of Ms. Christ.  (<u>Id.</u>)  He was not at home the night of July 22; however, when he arrived home the next morning he saw that the front door was open, some jewelry boxes had been knocked down, and there was jewelry on the floor.  (<u>Id.</u> at 327-28.)  The pillowcase found in the bag at St. Monica's matched the ones on his bed.  (<u>Id.</u> at 331.)  Some of the jewelry found in the bag belonged to him.  (<u>Id.</u> at 334-36.)

A certified latent examiner with the St. Louis County Police Department, Donna Knight, identified a fingerprint taken from the gun that was found by Detective Rich as belonging to Petitioner. (Id. at 346, 357.) Scott Worth, a police officer with the Department, identified photographs of the shoe prints on the seized table top. (Id. at 372.) The shoe prints were similar to Petitioner's shoes. (Id. at 374, 376.)

Another St. Louis County police officer, Damon Kunnemann, testified about a stop he had made of Petitioner on June 25, 1999. (Id. at 377-78.) Trial counsel objected to Officer Kunnemann's testimony; her objection was overruled. (Id. at 379.) Officer Kunnemann testified that he stopped the car Petitioner was driving on June 25 and requested that a photographer come and take photographs of items. (Id. at 381.) The photographer, Patricia Meyer, identified certain photographs as ones she had taken of the items. (Id. at 384, 386.) Those photographs included one of a sweatshirt with "No Limit" printed with a circle around a tank. (Id. at 386.) Officer Kunnemann testified that Petitioner had been permitted to retain the "No Limit" sweatshirt found in his trunk on June 25. (Id. at 398.)

The State rested its case. (Id. at 400.) Trial counsel called for a ruling on her motion to suppress statements and motion to suppress evidence seized from Petitioner,[2] arguing that suppression was required because Petitioner had not been given his Miranda warnings after being handcuffed. (Id. at 401.) Noting that no evidence had been seized at the

---

[2]These motions were filed five months before trial. (Resp. Ex. B at 11-14, 17-18.)

complained-of encounter and that no incriminating statements were introduced into evidence, the court overruled both motions.  (Id. at 402.)

Petitioner's sister and father testified on his behalf.  His sister, Vanessa Rhymes, testified that Petitioner called early in the morning of July 23 to ask her to pick up his car.  (Id. at 403, 406.)  He told her it was near some apartments and their approximate location; he had been out looking for apartments when the car had stopped.  (Id. at 406.)  She and her fiancé found the car.  (Id. at 407.)  The keys were under the floor mat.  (Id. at 408.)  They tried to start the car, but were unsuccessful.  (Id.)  In the car, there was an apartment guide; a small, hand-held televison set; a water cooler; and a small amount of money.  (Id. at 409, 413.)  When they later returned with her father, the papers were thrown all about.  (Id. at 410.)  The money and the television set were gone.  (Id. at 418.)  On cross-examination, Ms. Rhymes confirmed that she and her fiancé had left to find the car after her brother's call, but had not taken any valuables out of it.  (Id. at 419.)  She remembered that he told her about a church during the phone call, but did not remember him mentioning a statue.  (Id. at 421, 423.)  She also remembered seeing a sweatshirt at home in November or December 1999 like the one photographed in Petitioner's trunk.  (Id. at 425-26.)  She did not know why her brother would have a heavy sweatshirt in his trunk in June.  (Id. at 426.)

Petitioner's father, Valmore Woolford, Sr., drove to Petitioner's car after his daughter's fiancé was unable to start it.  (Id. at 434-36.)  He was able to start it and drove it back to his daughter's house.  (Id. at 436-37.)

After Petitioner rested his case and his motion for judgment of acquittal was denied, his trial counsel made the following remarks:

> I did want to make a motion that a nephew, Vanessa Rhymes' son I was told initially he had seen the shirt, the clothes were everywhere. Everybody was moving. And I asked him – he wasn't endorsed. I was going to ask for a late endorsement.
>
> I'm sure the State was going to oppose it. I asked him to describe the shirt, and he said – His name, by the way, Jamel Higinbotton [sic]. . . . He very truthfully told me the shirt was black and had a hood, but everything on the front of it was white. He remembered no red writing of No Limit. So I just left [sic] the issue go.

(Id. at 446.) She told Petitioner that his nephew "remembered everything being in white."

(Id. at 447.)

After being instructed and hearing closing arguments, the jury retired to deliberate.

(Id. at 493.) Ninety minutes later, they returned a guilty verdict on each of the charges.

(Id.)

Two months later, Petitioner was sentenced as a prior and persistent offender to an aggregate term of sixty years' imprisonment. (Id. at 501-03.)

Petitioner appealed, arguing, inter alia, that (1) the trial court had erred in overruling his objection to the introduction of evidence that Officer Kunnemann had found and photographed a hooded "No Limit" sweatshirt in the trunk of Petitioner's car after an earlier stop because such evidence was of a prior uncharged crime and was more prejudicial than probative; (2) the trial court abused its discretion in precluding trial counsel from inquiring of Detective Kohrs about Petitioner's willingness to give hair

samples, such prohibition denied him due process, a fair trial, and the right to present a defense because his cooperation was relevant to the issue of identity and was indicative of his innocence; and (3) the trial court had plainly erred in overruling his motion to suppress evidence because he was in police custody when his car was searched, but had not been given his Miranda rights and had not voluntarily consented to the search.[3] (Resp. Ex. C at 15-17.)

The appellate court rejected each argument. (Resp. Ex. E at 1-2.) Addressing Petitioner's claim about uncharged crimes, the court found:

> Here, the officer's testimony and the photograph [of the sweatshirt in the trunk] cannot be characterized as clear evidence associating Defendant with another crime. The photograph was introduced by a police officer who testified only that he had curbed a car driven by Defendant, had examined the contents of the trunk and had a photograph taken of the sweatshirt that was located in the trunk. There is no specific reference to another offense, nor any inference to be made from this evidence that Defendant had been involved in criminal activity or misconduct. . . .

(Id. at [9].) (Interim citations omitted.) The court next addressed his claim about the hair samples:

> The question to be decided in this case was whether Defendant committed the offenses of robbery, burglary and theft. The trial court excluded evidence regarding the hair samples and the lack of any tests results on the hair samples, reasoning that the offered evidence was irrelevant and immaterial, that it did not go to the elements of these offenses and further, that it would inject a false issue into the case. Given that no hair sample tests were performed, we see no abuse of discretion in the decision of the trial court to

---

[3]Petitioner also challenged his conviction on the stealing charge, arguing the State had failed to prove that the value of the property at issue was at least $750. (Resp. Ex. C at 14.) The appellate court agreed, reversed his conviction on this charge, and entered a conviction of misdemeanor stealing. State v. Woolford, 58 S.W.3d 87, 90 (Mo. Ct. App. 2001).

exclude evidence that would inject the issue of hair testing into the case and would likely divert the jury's attention away from the real question to be decided – whether defendant committed the charged offenses. As to Defendant's contention that he only wanted to offer this evidence to show the [sic] his willingness to cooperate, as indicative of his innocence, the court did permit defense counsel to adduce evidence that defendant had been cooperative; it would just not allow evidence referring to the hair samples.

(Id. at [10].)

Noting that trial counsel had raised the question whether Petitioner had voluntarily consented to a search of his car the night of July 22 but had not objected to testimony at trial about the search or raise the issue in the motion for new trial court, the appellate court reviewed Petitioner's last argument for plain error and found none. (Id. at [11]-[12].)

In looking at the totality of circumstances in this case, the trial court could reasonable conclude that Defendant's consent was voluntary, and therefore the testimony about what police officers observed in Defendant's car during this search was admissible. Defendant had been told he matched the description of an individual who was wanted in an armed robbery in a nearby neighborhood. Defendant then specifically consented to the police officers' separate requests to look inside his car and trunk; he even told the police officers where they might find his driver's license in the car. Only two police officers were present at the time consent was requested, there is no evidence of threats, coercion, or force by the police officers. Nor is there evidence that weapons were displayed. . . .

(Id.) Additionally, Petitioner's argument that he was not told he could refuse consent was without merit because Schneckloth v. Bustamonte, 412 U.S. 218 (1973), expressly rejected such a requirement; his argument that his consent was involuntary because he was in custody and handcuffed in the back of the police car was without merit because being in police custody did not render his consent involuntary; and his argument that his consent was involuntary because he was in custody and had not been given his Miranda warnings

was without merit because the police were not required to give the warnings prior to obtaining his consent to search.  (Id. at [11].)

While Petitioner's direct criminal appeal was pending, he moved for post-conviction relief pursuant to Missouri Supreme Court Rule 29.15.  (Resp. Ex. F at 3-8.)  The proceedings were stayed until the direct appeal was concluded.  (Id. at 15.)  After that event, his motion was amended by counsel and alleged that his trial court had been ineffective for, inter alia, (1) failing to (a) object to Officer DiPretore's testimony about Petitioner's references to St. Monica's during his telephone conversation with his sister on the grounds that a transcript of the call had been previously suppressed because it had been made without Petitioner's consent or (b) impeach her testimony with that transcript; (2) failing to investigate the location of Petitioner's "No Limit" sweatshirt to establish that the sweatshirt found in the bag was not the same as the one found in June 1999 in the trunk of his car; and (3) failing to move to suppress evidence of Petitioner's sweatshirt as being the product of an illegal stop and seizure.  (Id. at 19, 22, 29.)

Attached to the amended motion was a transcript of the telephone call.  (Id. at 59-86.)  Shortly after the conversation began, Petitioner told the person on the other end that he was in the Creve Coeur jail, not far from the church where a family member had been in a play.  (Id. at 61.)  He explained that after his car stopped, he started walking towards where the play had been.  (Id. at 62.)  He repeated it was at the school where the play had been and where a statue was.  (Id. at 63.)  He then told the other person where his car was stopped.  (Id.)  Again, he repeated that he had been walking to where the play had been.

(Id. at 64.)  The other person said she was trying to figure out where Petitioner's stuff was at; Petitioner explained it was where the play had been, where the statue was.  (Id. at 65-66.)  Petitioner asked the other person to go get his car.  (Id. at 67.)  He repeated he had been walking in the opposite direction of the gas sation.  (Id. at 69.)  After telling the other person that she did not know where she was going, Petitioner asked to speak to somebody else.  (Id. at 69.)  He told the other person about the place where the play had been.  (Id.)  He gave that person directions to that place.  (Id. at 70.)  Shortly thereafter, Petitioner named the place, St. Monica School, and referred to a "thing . . . sitting there."  (Id. at 71.)  He then explained, "[Y]ou have to go through a driveway, I think it is, and they have a statue sitting there . . ."  (Id.)  He said he was trying to give the other person landmarks so he would know that Petitioner knew where he was at.  (Id. at 72.)  He had been walking and looking for a service station when he crossed the street and realized where he was.  (Id. at 72-73.)  A short time later in the conversation, Petitioner wanted to let the other person know where he "was at and stuff and carrying on[.]"  (Id. at 76.)  If the other person needed "to go and pick up anything," he should remember where the play was and look around the driveway.  (Id.)  Petitioner remembered there was a statue there.  (Id. at 77.)  Petitioner told the other person, "[Y]ou know how you have to pick them babies up, right? . . . You definitely got to pick them up.  Okay?"  (Id.)  Petitioner asked, "[Y]ou know what I'm talking about, right?"  (Id.)  The other person asked, "The whole car?"  (Id. at 78.)  Petitioner replied, "No."  (Id.)  Petitioner repeated twice that it was bad enough

that "we" got separated.  (Id.)  He again reminded the other person of where the play had been and later of how to get there.  (Id. at 79-80.)

Petitioner's motion was denied without an evidentiary hearing.  (Id. at 89-93.)  The court found that (a) any objection by trial counsel to Office DiPretore's testimony about the overheard telephone conversation would have been overruled; (b) there was overwhelming evidence that the sweatshirt photographed in June 1999 and the one found in the "burglary bag" were the same and there was no allegation by Petitioner that the shirt he contended was actually his – one with red lettering, not white – had been found or about where it could be found; and (c) even if a motion to suppress evidence about the June 1999 photographs had been made and granted, there was no prejudice because "there was still ample evidence" of Petitioner's guilt.  (Id. at 90- 92.)

Petitioner appealed on the same three claims of ineffective assistance of trial counsel.  (Resp. Ex. G at 17-20.)  His first claim was rejected on the grounds that his statements during the telephone conversation were, contrary to his argument, admissions and not hearsay.  (Resp. Ex. I at 4.)  Moreover, the "rule of completeness" did not require the transcript's admission because there was no risk of distortion or exclusion of exculpatory information.  (Id. at 5.)  Indeed, the transcript would have corroborated Officer DiPretore's testimony, which had been attacked by trial counsel on the grounds that no telephone conversation had ever occurred.  (Id. at 5-6.)  Petitioner's second and third claims were denied for the reasons cited by the trial court.  (Id. at 6-7.)

Petitioner next filed a motion to recall the mandate, arguing that his appellate counsel was ineffective for failing to brief (1) an issue that the trial court had plainly erred in overruling his motion to suppress evidence and statements and (2) an issue that the trial court had plainly erred in overruling his objections to being fingerprinted during trial. (Pet. at 33, 36-37, 42.)  The motion was docketed on April 5, 2004, in his direct criminal appeal and denied on April 13.  State v. Woolford, No. ED78254 (Mo. Ct. App. Apr. 13, 2004), http://www.courts.mo.gov/casenet/cases/dockets.do.  The order read:

> Appellant has filed a motion to recall the mandate alleging ineffective assistance of appellate counsel.  Appellant was sentenced after January 1, 1996.  For a defendant sentenced after January 1, 1996, a claim of ineffective assistance of appellate counsel may only be raised in a Rule 29.15 motion. State v. Edwards, 983 S.W.2d 520, 522 (Mo. Banc 1999).  Appellant's claim is not cognizable in a motion to recall the mandate.  Appellant's motion is denied.

Id.

Petitioner now seeks federal habeas relief on the three grounds raised in his direct criminal appeal, the three grounds raised in his post-conviction appeal, and the two grounds raised in his motion to recall the mandate.  Respondent contends that of the six grounds raised in his appeals, five are without merit and one is non-cognizable.  The two grounds raised in Petitioner's motion to recall the mandate are procedurally barred. Petitioner vigorously disagrees.

## Discussion

Standard of Review.  Title 28 U.S.C. § 2254(d) mandates that a federal court "not grant habeas relief on a claim that was adjudicated on the merits in state court unless 'it

resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,'" **James v. Bowersox**, 187 F.3d 866, 869 (8th Cir. 1999) (quoting § 2254(d)(1)), or it "'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding,'" **Evans v. Rogerson**, 223 F.3d 869, 871 (8th Cir. 2000) (quoting § 2254(d)(2)). See also **Weaver v. Bowersox**, 241 F.3d 1024, 1029 (8th Cir. 2001) ("Section 2254(d) distinguishes between two types of erroneous decisions – those of law and those of fact[.]").

The "contrary to" clause and the "unreasonable application" clause have independent meanings. **Williams v. Taylor**, 529 U.S. 362, 405 (2000). "[A] state court decision is 'contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases' or 'if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [their] precedent.'" **Lockyer v. Andrade**, 538 U.S. 63, 73 (2003) (quoting Williams, 529 U.S. at 405-06) (alterations added). "On the other hand, a run-of-the-mill state-court decision applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." **Williams**, 529 U.S. at 406 (alteration added). Thus, a state court decision that correctly identifies the controlling legal authority and, applying that authority, rejects a prisoner's claim does not fit within

the "contrary to" clause although it might be contrary to a federal court's conception of how that authority ought to be applied in that particular case. **Id.**

Such a state court decision can, however, fit within the "unreasonable application" clause. **Id.** at 407-08. "[W]hen a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case, a federal court applying § 2254(d)(1) may conclude that the state-court decision falls within that provision's 'unreasonable application' clause." **Id.** at 409 (alterations added). "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." **Id.** (alteration added). When making this inquiry, a federal habeas court should note that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." **Id.** at 410. "It is not enough that a federal habeas court, in its independent review of the legal question, is left with a firm conviction that the state court was erroneous." **Lockyer**, 538 U.S. at 75 (internal quotations omitted). And, "'[t]o the extent that inferior federal courts have decided factually similar cases, reference to those decisions is appropriate in assessing the reasonableness . . . of the state court's treatment of the contested issue.'" **Copeland v. Washington**, 232 F.3d 969, 974 (8th Cir. 2000) (quoting Long v. Humphrey, 184 F.3d 758, 761 (8th Cir. 1999)) (alterations in original). Additionally, "the [state courts'] 'summary nature' of the discussion of [a] federal constitutional question does not

preclude application of the AEDPA standard." **Brown v. Luebbers**, 371 F.3d 458, 462 (8th Cir. 2004) (alterations added).

Ground One: Evidence of Uncharged Crimes. In the instant case, the Missouri Court of Appeals rejected Petitioner's argument about uncharged misconduct, finding that neither Officer Kunnemann's testimony nor the photograph could "be characterized as clear evidence associating [Petitioner] with another crime." Petitioner contends that the admission of the testimony and photograph violated his constitutional rights.

"[I]n habeas corpus proceedings, it is not within [the federal courts'] province to 'reexamine state-court determinations on state-law questions.'" **Johnston v. Luebbers**, 288 F.3d 1048, 1056 (8th Cir. 2002) (quoting Estelle v. McQuire, 502 U.S. 62, 67-68 (1991)) (alterations added). See also **Taylor v. Bowersox**, 329 F.3d 963, 968 (8th Cir. 2003) ("A state's interpretation of its own law is virtually unreviewable by a federal court."). Thus, "'[a] state court's evidentiary rulings can form the basis for habeas relief under the due process clause only when they were so conspicuously prejudicial or of such magnitude as to fatally infect the trial and deprive the defendant of due process.'" **Osborne v. Purkett**, 411 F.3d 911, 917 (8th Cir. 2005) (quoting Parker v. Bowersox, 94 F.3d 458, 460 (8th Cir. 1996)) (alteration added). Accord **Rousan v. Roper**, 436 F.3d 951, 958-59 (8th Cir. 2006); **Amrine v. Bowersox**, 238 F.3d 1023, 1032-33 (8th Cir. 2001); **Bounds v. Delo**, 151 F.3d 1116, 1119 (8th Cir. 1998). "[T]his due process standard mandates a greater showing of prejudice than is needed to support a finding of

plain error on appeal."  **Griffin v. Delo**, 33 F.3d 895, 905 (8th Cir. 1994) (alteration added).  Consequently, federal habeas review of an alleged due process violation in a state court conviction is narrow.  **Anderson v. Goeke**, 44 F.3d 675, 679 (8th Cir. 1995).

The state appellate court concluded that the complained-of evidence was not of uncharged crimes.  This is an evidentiary ruling not to be re-examined on federal habeas review.  Moreover, even if evidence that Petitioner had been pulled over and stopped by a police officer and that the contents of the trunk of his car had been photographed was of uncharged misconduct, the evidence was limited to that necessary to establish the presence of the "No Limit" sweatshirt in Petitioner's possession the month before it was found in the "burglary bag."  This, in turn, was relevant to the issue of identity.

In **Osborne**, 411 F.3d at 916-17, the habeas petitioner, challenging a rape conviction,  argued that his due process rights had been violated when the state trial court admitted evidence of sexual contact between him and the victim for which he had not been charged.  The Eighth Circuit Court of Appeals noted that the Missouri Court of Appeals had applied the same standard for admissibility as that used in federal courts in accordance with Supreme Court precedent:  evidence of uncharged crimes was not admissible to show the propensity of the defendant to commit the crime for which he was on trial but was admissible to establish, among other things, identity.  **Id.**  In **Rainer v. Department of Corrections**, 914 F.2d 1067, 1071 (8th Cir. 1990), the Eighth Circuit found no due process violation in the admission at the petitioner's state criminal trial for first degree

murder of his girlfriend evidence of prior misconduct toward three former wives, although that misconduct had occurred years before the murder. See also **Poole v. Wood**, 45 F.3d 246, 250 (8th Cir. 1995) (finding no due process violation in admission of evidence of 1979 sexual contact with 14-year old relative in trial of doctor charged with criminal sexual conduct committed against female patients between 1987 and 1990).

The evidence challenged in the foregoing cases was clearly of prior bad acts, but was found not to have violated the habeas petitioner's due process rights. As noted above, the evidence of misconduct in the instant case was of a traffic stop and was clearly relevant to the issue of identity. The admission of such evidence did not deny Petitioner due process.

Ground Two: Evidence of Cooperation. Petitioner next challenges the exclusion of evidence that he volunteered to provide a hair sample. He argues that such evidence was indicative of his innocence – the jury could infer that he would only have volunteered a hair sample if he knew it would not match the ones found on the ski mask. The trial court found, and the appellate court affirmed, that this evidence was irrelevant and immaterial without any test on the hair samples. Moreover, Petitioner was able to otherwise introduce evidence of his willingness to cooperate.

"The exclusion of [evidence] based on state evidentiary rules results in the denial of due process only if there was an impropriety so egregious that it made the entire proceeding fundamentally unfair." **Skillicorn v. Luebbers**, 475 F.3d 965, 972 (8th Cir. 2007) (alteration added). "To meet this burden, a habeas petitioner must show that 'absent

the alleged impropriety the verdict probably would have been different.'" **Id.** (quoting

Anderson, 44 F.3d at 679).

Petitioner has not, and cannot, make this showing. The jury heard evidence that he

was cooperative. Further evidence that he volunteered to provide hair samples would not

have tipped the balance in favor of acquittal given the evidence that he was stopped the

night of July 22 running across a street from a church that was on the opposite of an

Interstate overpass from where his car was parked; that he explained he was looking for

a telephone or gas station, both of which were within sight of where his car was parked;

that a bag with items taken from Ms. Christ's and Mr. Eggleston's houses was found by a

statue on the church grounds; that a "No Limit" sweatshirt found in the bag matched a

sweatshirt found in his car the month before; that a ski mask found in the bag matched one

worn by the man who pointed a gun at Ms. Christ; that in a telephone conversation

ostensibly conducted to tell a family member where his car was parked he mentioned the

church and school on the opposite side of the overpass a significant number of times; that

his fingerprint matched one on a gun found near where Petitioner had been seen that night;

and that his shoe print matched one on a table top in a house near Ms. Christ's and Mr.

Eggleston's.

Ground Three: Motion to Suppress. In his third ground, Petitioner argues that the

trial court plainly erred in overruling his motions to suppress.

It is well established that "[a] Fourth Amendment claim of an unconstitutional search

or seizure is not cognizable in a habeas corpus action unless the state has not 'provided an

opportunity for full and fair' litigation of the claim." **Sweet v. Delo**, 125 F.3d 1144, 1149 (8th Cir. 1997) (quoting <u>Stone v. Powell</u>, 428 U.S. 465, 494 (1976)) (alteration added). Accordingly, a federal court is "not empowered to examine whether the Missouri courts made errors of law in deciding the Fourth Amendment issues argued by [a habeas petitioner]." **Id.** (alteration added). A federal court is empowered to review a petitioner's Fourth Amendment claim "'(a) if the state has provided no *corrective procedures at all* to redress the alleged [F]ourth [A]mendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an *unconscionable breakdown in the underlying process*.'" **Willett v. Lockhart**, 37 F.3d 1265, 1271 (8th Cir. 1994) (quoting <u>Capellan v. Riley</u>, 975 F.2d 67, 71 (2d Cir. 1992)) (alterations added). <u>Accord</u> **Palmer v. Clarke**, 408 F.3d 423, 437 (8th Cir. 2005). Thus, "[t]he federal courts on habeas review of [Fourth Amendment] claims are not to consider whether full and fair litigation of the claims *in fact* occurred in the state courts, but only whether the state provided an opportunity for such litigation." **Willett**, 37 F.3d at 1272 (alterations added).

Petitioner's trial counsel filed motions to suppress and asked for a ruling on the motions at the close of the State's case. Petitioner does not argue that this process denied him an opportunity to present any relevant evidence or make any appropriate arguments. Instead, he argues the merits of the motions. This re-examination is foreclosed by <u>Stone</u>. See **Sweet**, 125 F.3d at 1149. <u>See also</u> **Anderson v. Hopkins**, 113 F.3d 825, 831 (8th Cir.

1997) (holding that habeas petitioner was not entitled to argue before federal court that witness's testimony should have been suppressed because it was indirectly derived from an illegal wiretap; petitioner had had a full and fair opportunity to litigate claim in state court).

    Grounds Four, Five, and Six: Ineffective Assistance of Counsel.  Petitioner seeks habeas relief on three claims of ineffective assistance of trial counsel.  First, trial counsel failed to object to Officer DiPretore's testimony about Petitioner's references to St. Monica's during his telephone conversation or to impeach that testimony with a transcript of the call.[4]  Second, trial counsel failed to investigate the location of Petitioner's "No Limit" sweatshirt to establish that the sweatshirt found in the bag was not his.  Third, trial counsel failed to move to suppress evidence of Petitioner's sweatshirt as being the product of an illegal stop and seizure.

    "The right to effective assistance of counsel 'is a fundamental right of criminal defendants; it assures the fairness, and thus the legitimacy, of our adversary process.'" **Smith v. Rogerson**, 171 F.3d 569, 572 (8th Cir. 1999) (quoting Kimmelman v. Morrison, 477 U.S. 365, 374 (1986)).  "'The benchmark for judging any claim of ineffectiveness [of

---

[4]In his traverse, Petitioner also argues that trial counsel was ineffective for not calling William Cheatum to testify that he was part of the telephone conversation and that Petitioner did not ask or imply that he should go pick up stolen property.  "'[A] federal habeas petitioner's claims must rely on the same factual and legal bases relied on in state court.'"  **Interiano v. Dormire**, 471 F.3d 854, 856 (8th Cir. 2006) (quoting Winfield v. Roper, 460 F.3d 1026, 1034 (8th Cir. 2006)) (alteration in original).  The factual allegations about Mr. Cheatum were not presented to the state courts and were raised for the first time in January 2005.  They are clearly either procedurally barred or untimely.

counsel] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [relevant proceeding] cannot be relied on as having produced a just result.'" **Jackson v. Gammon**, 195 F.3d 349, 354 (8th Cir. 1999) (quoting Kellogg v. Skon, 176 F.3d 447, 452 (8th Cir. 1999)) (first alteration added; second in original). "Only reasonable competence, the sort expected of the ordinary fallible lawyer, is demanded by the Sixth Amendment." **White v. Helling**, 194 F.3d 937, 941 (8th Cir. 1999) (internal quotations omitted). Moreover, "[t]here is a strong presumption that counsel's challenged actions or omissions were, under the circumstances, sound trial strategy." **Garrett v. Dormire**, 237 F.3d 946, 949-50 (8th Cir. 2001) (alteration added).

To establish that counsel's lack of competence violated the Sixth Amendment, the petitioner must show that counsel's performance was deficient and prejudicial. **Kellogg**, 176 F.3d at 452. To establish that counsel's performance was deficient, a petitioner must show that counsel "'made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" **Greiman v. Thalacker**, 181 F.3d 970, 971 (8th Cir. 1999) (quoting Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish prejudice, a petitioner must demonstrate "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" **Id.** (quoting Strickland, 466 U.S. at 697). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" **Carroll v. Schriro**, 243 F.3d 1097, 1100 (8th Cir. 2001) (quoting Strickland, 466 U.S. at 694). "In making this

determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.'" **Lawrence v. Armontrout**, 31 F.3d 662, 666 (8th Cir. 1994) (quoting Strickland, 466 U.S. at 695). The burden of showing a reasonable probability is the petitioner's. **Lawrence v. Armontrout**, 961 F.2d 113, 115 (8th Cir. 1992).

The question of prejudice from counsel's performance need not be reached if the performance was not deficient. See **Parkus v. Bowersox**, 157 F.3d 1136, 1140 (8th Cir. 1998). Conversely, the question of counsel's allegedly deficient performance need not be reached if a petitioner has failed to show prejudice. See **Strickland**, 466 U.S. at 697; **Hoon v. Iowa**, 313 F.3d 1058, 1061 (8th Cir. 2002); **Siers v. Weber**, 259 F.3d 969, 974 (8th Cir. 2001). Thus, if a petitioner has failed to show that, but for an allegedly deficient performance by his trial counsel, there is a reasonable probability that the outcome of his trial would have been different, his claim of ineffective assistance of counsel fails. **Morales v. Ault**, 476 F.3d 545, 550 (8th Cir. 2007).

Petitioner's first claim of ineffective assistance of trial counsel was rejected by the state courts on the grounds that any objection would have been meritless because Petitioner's statements were admissions and the "rule of completeness" did not require the admission of the transcript.

To grant relief on Petitioner's objection claim, this court would have to effectively overrule the state courts' findings that the testimony was admissible under state law. This

the court may not do. See **Ford v. Norris**, 364 F.3d 916, 918-19 (8th Cir. 2004) (concluding that district court had erred by finding that trial counsel was ineffective for failing to object to prosecutor's statements; state supreme court had concluded that any objection "would "probably have been overruled" and it decided what state law was). See also **Gray v. Bowersox**, 281 F.3d 749, 756 n.3 (8th Cir. 2002) (noting that a claim of ineffective assistance for failure to make an objection is not viable when the objection is without merit).

Nor was trial counsel ineffective for not introducing the transcript of the telephone call. Contrary to Petitioner's claim, the transcript would have verified Officer DiPretore's recollection of the number of times Petitioner referred in some manner to St. Monica's. Because Petitioner cannot establish prejudice from trial counsel's failure to introduce the transcript, the court need not determine whether trial counsel's performance was deficient.

Petitioner also argues that trial counsel was ineffective for failing to establish that the "No Limit" sweatshirt found in the bag was not his. He further argues that the reason he cannot establish the current whereabouts of his sweatshirt is trial counsel's failure to timely locate and "secure" it.

Trial counsel stated at trial that she had spoken to Petitioner's nephew, Jamel Higginbotton, before trial and he recalled Petitioner's "No Limit" sweatshirt as being similar to the one found in the bag. In support of his habeas petition, Petitioner submits Mr. Higginbotton's affidavit that Petitioner's "No Limit" sweatshirt had red lettering – not white like the one in the bag – and was at his house in November 1999.

Petitioner was charged in July 1999; the counsel who represented him at trial entered her appearance in November 1999. (Resp. Ex. B at 1, 3.) The "No Limit" sweatshirt Petitioner claims should have been located was last seen in November or December 1999. He blames trial counsel for its absence at trial in May 2000. He has failed, however, to show that she learned of its existence within days of entering her appearance. He, on the other hand, would have known of its existence, as would his sister and his nephew. The failure to make the sweatshirt available or to introduce it is Petitioner's, not trial counsel's.

In his final claim of ineffective assistance, Petitioner claims that trial counsel should have filed a motion to suppress evidence of the "No Limit" sweatshirt found in the trunk of his car as being the product of an illegal search and seizure.

As noted above, to prevail on this claim, Petitioner "must do more than show that he would have satisfied Strickland's test if his claim were being analyzed in the first instance[.]" **Bell v. Cone**, 535 U.S. 685, 698-99 (2002) (alteration added). Under § 2254(d), "he must establish that the state court 'applied Strickland to the facts of his case in an objectively unreasonable manner.'" **Skillicorn**, 475 F.3d at 973. Petitioner cannot.

The state courts found that, even if a motion to suppress had been made and granted, there was no prejudice. The "No Limit" sweatshirt photographed in the earlier, complained-of search, was introduced to establish Petitioner's identity. There was also evidence of his fingerprint found on a gun where he had been seen the night in question, of the ski mask in the bag identified by Ms. Christ as belonging to the man who pointed

a gun at her; and of his connection to the place where the bag was found.  The state court's finding of no prejudice was reasonable.

Grounds Seven and Eight: Ineffective Assistance of Appellate Counsel.  Petitioner's last two claims are of ineffective assistance of appellate counsel.  Respondent argues these claims are procedurally barred.

Title 28 U.S.C. § 2254(b)(1)(A) and the Supreme Court bar the granting of habeas corpus relief unless it appears that the state prisoner has exhausted available state court remedies.  See **Baldwin v. Reese**, 541 U.S. 27, 27 (2004); **Gray v. Netherland**, 518 U.S. 152, 161 (1996); **Coleman v. Thompson**, 501 U.S. 722, 730 (1991).  "A habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer 'available' to him."  **Id.** at 732.  However, "'[o]ut of respect for finality, comity, and the orderly administration of justice, a federal court will not entertain a procedurally defaulted constitutional claim in a petition for habeas corpus absent a showing of cause and prejudice to excuse the default.'" **Cagle v. Norris**, 474 F.3d 1090, 1099 (8th Cir. 2007) (quoting Dretke v. Haley, 541 U.S. 386, 388 (2004)) (alteration added).  "This rule is nearly absolute, barring procedurally-defaulted petitions unless a habeas petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or show actual innocence.'" **Id.** (quoting Reagan v. Norris, 279 F.3d 651, 652 (8th Cir. 2002)).  Accord

**Winfield v. Roper**, 460 F.3d 1026, 1034 (8th Cir. 2006); **Moore-El v. Luebbers**, 446 F.3d 890, 896 (8th Cir. 2006).

"'[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.'" **Ervin v. Delo**, 194 F.3d 908, 915 (8th Cir. 1999) (quoting Murray v. Carrier, 477 U.S. 478, 488 (1986)) (alteration in original). There is no exhaustive catalog of the objective impediments, nor have the precise contours of the cause requirement been clearly defined. **Ivy v. Caspari**, 173 F.3d 1136, 1140 (8th Cir. 1999). "At a minimum, however, [Petitioner] must show that 'something *external* to [him], something that cannot fairly be attributed to him,' caused the procedural default." **Id.** (quoting Coleman, 501 U.S. at 753) (first alteration added; second in original).

Petitioner was sentenced in July 2000. Missouri Supreme Court Rule 29.15 was amended in June 1995, effective January 1, 1996, to provide that the rule was the exclusive procedure to raise claims of ineffective assistance of trial and *appellate* counsel by defendants sentenced after January 1, 1996. **State v. Edwards**, 983 S.W.2d 520, 522 n.2 (Mo. 1999) (en banc). This amendment effectively prohibited the use of a motion to recall the mandate as a means to raise claims of ineffective assistance of counsel. **Collins v. State**, 54 S.W.3d 226, 229 (Mo. Ct. App. 2001). A motion to recall the mandate was the means used by Petitioner to raise his claims of ineffective assistance of appellate counsel. The appellate court denied his claims on procedural grounds. "Federal habeas

review of a state court decision is not available 'if the decision rests on a state law ground that is independent of the federal question and adequate to support the judgment,' regardless of 'whether the state law ground is substantive or procedural.'" **Bell v. Attorney General of State of Ia.**, 474 F.3d 558, 560 (8th Cir. 2007) (quoting <u>Coleman</u>, 501 U.S. at 729).

Petitioner argues that the failure to properly raise his claims of ineffective assistance of appellate counsel is attributable to his post-conviction counsel. Because counsel was appointed, the fault should be imputed to the State and not to Petitioner. This argument is foreclosed by Supreme Court precedent, see **Coleman**, 501 U.S. at 752-53 (ineffective assistance of post-conviction cannot constitute cause for a procedural default), and Eighth Circuit precedent, see **Burns v. Gammon**, 173 F.3d 1089, 1092 (8th Cir. 1999) (ineffective assistance of post-conviction counsel, "either retained or appointed," is not cause for a procedural default); **Rehbein v. Clarke**, 94 F.3d 478, 484 (8th Cir. 1996) (rejecting claim that ineffective assistance of appointed post-conviction counsel established cause for procedural default).

Absent cause for his default, Petitioner's grounds are procedurally barred. They may, however, still be reached on their merits if Petitioner establishes that a failure to do so will result in a fundamental miscarriage of justice. <u>See</u> **Moore-El v. Luebbers**, 446 F.3d 890, 896 (8th Cir. 2006); **Weaver v. Bowersox**, 438 F.3d 832, 838 (8th Cir. 2006). The fundamental miscarriage of justice exception is applicable when a petitioner makes a

showing, based on new evidence, that a "'constitutional violation has probably resulted in the conviction of one who is actually innocent.'"  **Osborne**, 411 F.3d at 920 (quoting Murray, 477 U.S. at 496).  Accord **Cox v. Burger**, 398 F.3d 1025, 1031 (8th Cir. 2005).  The new evidence must be "reliable evidence that was not available at trial[.]"  **Nance v. Norris**, 392 F.3d 284, 291 (8th Cir. 2004) (alteration added).  This evidence must also be such that it could not "have been discovered earlier in the exercise of due diligence.'"  **Id.** at 292 (quoting Cornell v. Nix, 976 F.2d 376, 380 (8th Cir. 1992) (en banc)).  There are only two new items of evidence, the affidavits of Messrs. Cheatum and Higginbotton.  Both could have been discovered earlier.  Moreover, the former is contradicted by the transcript of the telephone call; the latter by trial counsel's statements.  Neither establishes the necessary exception to permit Petitioner's defaulted claims to be reached on their merits.

## Conclusion

For the foregoing reasons, the state appellate court's resolution of the five § 2254 claims Petitioner presented to that court are not contrary to clearly established Federal Law, or not an unreasonable application of such law, and are not an unreasonable determination of the facts.  Consequently, these claims are unavailing. His remaining three claims are also unavailing because (a) the Fourth Amendment claim is not cognizable in

this proceeding and (b) his two claims of ineffective assistance of appellate counsel are procedurally barred.  Accordingly,

**IT IS HEREBY RECOMMENDED** that the 28 U.S.C. § 2254 petition of Valmore Woolford, Jr., be **DENIED** without further proceedings.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact.  See **Griffini v. Mitchell**, 31 F.3d 690, 692 (8th Cir. 1994).

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 11th day of May, 2007.